IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS, INDIANA

| | |
|---|---|
| CAMILLE WALLACE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CAUSE NO. 1:21-cv-01069-SEB-MG |
| | ) |
| ROSE HULMAN INSTITUTE | ) |
| OF TECHNOLOGY, INC. | ) |
| | ) |
| Defendants. | ) |

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, named-above, files her amended complaint, which asserts claims that arise out of the conduct, transactions or occurrences set out in Plaintiff's original complaint. Said complaint is filed as a matter of course pursuant to Fed. R. Civ. P. 15 (a)(1). Defendant filed a motion under Fed. R. Civ. P. 12(e) on May 20, 2021. This amended complaint is within twenty-one (21) days after Defendant filed its' 12(e) motion.

### JURISDICTION

1. This suit is authorized and instituted pursuant to Title VII 42 U.S.C. § 2000e et. seq., as amended; 42 U.S.C. § 1981 as amended; the Family Medical Leave Act (FMLA) 29 U.S.C.§ 2601 et seq. and 28 U.S.C. §§ 1331 and 1343.

2. Plaintiff filed a claim with the Equal Employment Opportunity Commission (EEOC) on August 3, 2020, and received a notice of right to sue on or about February 10, 2021.

### PARTIES

3. Plaintiff is black and at all relevant times, resided in the Southern District of Indiana.

4. Defendant is a corporation doing business in the State of Indiana in the Southern District of Indiana.

5. Defendant employees over 50 employees within a 75-mile radius of Defendant's worksite in which Plaintiff worked.

## FACTS

6. Plaintiff began working for Defendant on March 4, 2013, as a Special Events Manager and Planned Giving Assistant.

7. Plaintiff performed her job well.

8. All of her performance evaluations were good.

9. She was commended on her work performance.

10. In 2014 she was promoted to Training and Development Manager in the Office of Professional and Organizational Development.

11. In March 2018 the Director of Diversity and Inclusion resigned.

12. She resigned due to health difficulty brought on by racial disparities and mistreatment she endured at Rose Hulman.

13. Plaintiff was subsequently promoted to Interim Director of Diversity and Inclusion.

14. In August 2019 Plaintiff was named permanent Director of Diversity and Inclusion.

15. Plaintiff suffered racial harassment throughout her employment with Defendant.

16. Employees frequently touched Plaintiff's hair without her consent and asked if it was real.

17. Employees commented on the color of her skin.

18. Plaintiff refused to allow co-employees to speak to her in a condescending manner, her supervisor began referring to her as "diva".

19. When Plaintiff discussed with the supervisor what she felt was the racial bias in being referred to as "diva" for refusing to allow co-employees to speak to her in a condescending manner,

he responded by saying he did not know what the fuss was about, "we all came over on a boat anyway".

20. Plaintiff complained to the Director of Human Resources, but no action was taken.

21. Plaintiff complimented the President on an announcement he made regarding Defendant acquiring property, he responded by saying "you did say you wanted 40 acres and a mule didn't you?"

22. Near the time Plaintiff was promoted to Interim Director of Diversity and Inclusion, Defendant hired Megan Elliott as a Senior Director of Human Resources.

23. Soon after starting her employment Ms. Elliott, who is white, told Plaintiff she understood her experience as a minority female because she is white and had grown up in Hawaii.

24. Ms. Elliott's racial bias was evident soon after she was hired, she treated Plaintiff as if she was incompetent.

25. Ms. Elliott inserted herself into the affairs of the Office of Diversity and Inclusion even though the office was not part of Human Resources nor within Ms. Elliott's responsibilities.

26. Ms. Elliott pushed her own diversity initiatives and insisted that Plaintiff share her own "story".

27. Ms. Elliott made assumptions about Plaintiff's background.

28. Plaintiff was concerned about Ms. Elliott's bias and complained to her supervisor, the Senior Vice President.

29. He agreed that Ms. Elliott had made assumptions about Plaintiff's background and told Plaintiff to continue with the programming she had planned for the year.

30. Ms. Elliott's behavior only worsened.

31. She continued to insert herself into affairs of the Office of Diversity and Inclusion.

32. She restructured the physical space of the Office of Diversity and Inclusion without

Plaintiff's input.

33. Plaintiff again complained to the Senior Vice President that her vision for the office was not being fulfilled due to Ms. Elliott's interference.

34. In January 2019 Ms. Elliott was promoted to Vice President of Human and Environmental Services.

35. The Senior Vice President, to whom Plaintiff had complained, was promoted to President and he restructured the staff such that Plaintiff was now under the supervision of Ms. Elliott.

36. Ms. Elliott continued to treat Plaintiff less favorably than white employees.

37. Ms. Elliott brought coffee to white staff members, but not to Plaintiff.

38. Ms. Elliott engaged in team building activities with white team members such as retreats and training trips, but Plaintiff was not included.

39. Ms. Elliott routinely had collegial interactions with white staff members; however, her interactions with Plaintiff consisted of contentious weekly meetings wherein Ms. Elliott would make unfounded accusations and force Plaintiff to defend herself, instead of discussing upcoming programming.

40. Unlike white staff members Plaintiff was required to notify Ms. Elliott anytime she would be out of the office, even for short periods. Even when Plaintiff was on approved travel, Ms. Elliott would question her whereabouts. Other director level employees had latitude and autonomy over their areas, budgets, travels and agendas.

41. Ms. Elliott requested Plaintiff to post "self-stick notes" on her door every time she left her office, even if she was just going to the restroom. White employees were not required to do the same.

42. Ms. Elliott challenged Plaintiff on minor office details such as how she phrased her

out-of-office message.

43. In February 2019 Ms. Elliott informed Plaintiff she was evaluating the effectiveness of Plaintiff's diversity training because white supervisors found Plaintiff's race to be intimidating. Ms. Elliott further stated the staff felt more comfortable with Ms. Elliott conducting the diversity training because they felt "safer talking about diversity with a white woman".

44. Ms. Elliott thereafter conducted her own diversity programming and training.

45. Plaintiff continued to share her concerns about bias and negative culture for minorities, however, rather than addressing the negative conduct of white staff members, Ms. Elliott would place the burden on Plaintiff to adjust to their biases.

46. For example, when the white bookstore manager complained the Center for Diversity and Inclusion had become "a place where black kids hang out" and "that she and others felt this was not welcoming to the white staff", Ms. Elliott told Plaintiff perception is important and she should take steps to make the white bookstore manager feel more comfortable.

47. Ms. Elliott often referred to black students as "your students" when speaking to Plaintiff, despite the fact that Plaintiff was not a faculty member.

48. The "your students" comment often related to Ms. Elliott saying that black students in the Center for Cultural Diversity were unruly or making white employees feel uncomfortable.

49. Plaintiff never heard such comments regarding gatherings of white students despite the same level of noise, activity and disruption.

50. Eventually the stress of Ms. Elliott's scrutiny and biased treatment began to impact Plaintiff's health.

51. She began to experience insomnia, depression, anxiety, recurring hives, psoriasis, eczema, hair loss, weight loss and loss of appetite.

52. Plaintiff applied for and was granted leave under the Family Medical Leave Act

("FMLA").

53. Ms. Elliott responded to Plaintiff's leave by telling Plaintiff to inform her if she was planning to leave Defendant. Plaintiff had done nothing to indicate she was leaving Defendant.

54. Plaintiff started her leave on September 23, 2019.

55. On October 10, 2019, while Plaintiff was on FMLA leave she emailed her program coordinator about some information she received. However, Ms. Elliott responded by telling Plaintiff she is to do no work of Defendant's while she is on leave.

56. Plaintiff is aware of white staff members who kept up with work emails and handed off work related issues while they were on leave.

57. Nevertheless, a few days later Ms. Elliott emailed Plaintiff and demanded that Plaintiff physically come into the office even though she was still on FMLA leave. Ms. Elliott stated she had questions about Plaintiff's spending and wanted to go through her Rose Hulman credit card statement line by line.

58. This excessive and racially biased scrutiny was the very reason that cased Plaintiff to need FMLA leave and Ms. Elliott's demand for Plaintiff to physically come to the workplace is a violation of Plaintiff's rights under the FMLA.

59. To avoid an exacerbation of her condition Plaintiff decided to not come to the workplace at that time and informed Ms. Elliott she would discuss the expense records upon her return from leave.

60. Ms. Elliott responded by saying that if Plaintiff did not physically return to the workplace, she would complete the alleged investigation and determine discipline without Plaintiff's input.

61. On October 25, 2019, Plaintiff was terminated.

62. The reason given for Plaintiff's termination was alleged inappropriate purchase card

use.  Plaintiff was accused of charging unnecessary hotel room the night before the Indiana Black Expo, charged Lyft rides with no work-related purpose and that a car service Plaintiff used was excessive.  None of which is true.

63. Similarly situated white employees have made similar expenditures and purchases but have not been scrutinized and treated as harshly as Plaintiff.

64. The reason given for Plaintiff's termination is a pretext for illegal discrimination, harassment and retaliation, due to Plaintiff's race and protected activity.

### COUNT I

65. Plaintiff incorporates by reference paragraphs 1 through 64.

66. Defendant as a result of discriminating against Plaintiff due to her race violated Title VII 42 U.S.C. § 2000e et. seq.

### COUNT II

67. Plaintiff incorporates by reference paragraphs 1-64.

68. Defendant as a result of discriminating against Plaintiff due to her race violated 42 U.S.C. § 1981 et. seq.

### COUNT III

69. Plaintiff incorporates by reference paragraphs 1-64.

70. Defendant as a result of retaliating against Plaintiff for engaging in protected activity violated Title VII 42 U.S.C. § 2000e et. seq.

### COUNT IV

71. Plaintiff incorporates by reference paragraphs 1-64.

72. Defendant as a result of retaliating against Plaintiff for engaging in protected activity has violated 42 U.S.C. § 1981.

## COUNT V

73. Plaintiff incorporates by reference paragraphs 1-64.

74. Defendant as a result of retaliating against Plaintiff for taking family medical leave violated the FMLA 29 U.S.C. § 2601 et. seq.

## COUNT VI

75. Plaintiff incorporates by reference paragraphs 1-64.

76. Defendant as a result of interfering with Plaintiff's rights under the FMLA violated FMLA 29 U.S.C. § 2601 et. seq.

## COUNT VII

77. Plaintiff incorporates by reference paragraphs 1-64.

78. Defendant as a result of retaliating against Plaintiff for exercising her rights under the FMLA violated the FMLA 29 U.S.C. § 2601 et. seq.

## COUNT VIII

79. Plaintiff incorporates by reference paragraphs 1-64.

80. Defendant as a result of creating a harassing and hostile work environment, due to Plaintiff's race, violated Title VII 42 U.S.C. § 2000e et. seq.

## COUNT IX

81. Plaintiff incorporates by reference paragraphs 1-64.

82. Defendant as a result of creating a harassing and hostile work environment, due to Plaintiff's race, violated 42 U.S.C. § 1981.

## **CLAIM FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully prays the Court grant the following relief:

A.     Award Plaintiff back pay and benefits lost.

B. Award Plaintiff compensatory damages for future pecuniary loss, emotional pain and suffering, inconvenience, mental anguish and loss of enjoyment of life;

C. Award Plaintiff punitive damages.

D. Award Plaintiff liquidated damages.

E. Award Plaintiff her costs in this action and reasonable attorney's fees.

F. Grant Plaintiff any and all other relief which is allowable under the circumstances of this case.

Respectfully submitted,

**STOWERS & WEDDLE P.C.**

\_\_s/Gregory A. Stowers_____
Gregory A. Stowers, #13784-49
Attorney for Plaintiff

## REQUEST FOR JURY TRIAL

Comes now the Plaintiff, by counsel, and requests that this cause be tried by jury.

Respectfully submitted,

s/Gregory A. Stowers
Gregory A. Stowers, #13784-49

**STOWERS & WEDDLE P.C.**
626 N. Illinois Street
Suite 201
Indianapolis, IN 46204
(317)636-6320